IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ALEX DAVILA and CTR MOTORS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ADESA UTAH, LLC d/b/a ADESA SALT LAKE and ADESA, INC.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br>Case No. 2:20-CV-55 TS-JCB |

Plaintiffs sue the auction service that facilitated the sale of a car later impounded by police because it had been reported stolen.[1] Both Plaintiffs and Defendants have filed motions for summary judgment. For the reasons below, the court will deny Plaintiffs' motion and grant Defendants' motion.

I. BACKGROUND

Plaintiff Alex Davila is a resident of Utah County in the business of motor sales. Davila is the sole member of Plaintiff CTR Motors, LLC, a limited liability company.

Defendant ADESA Utah, LLC d/b/a ADESA Salt Lake is a limited liability company comprised of a single member, Defendant ADESA, Inc., which is incorporated in Delaware and maintains its principal place of business in Indiana.[2] ADESA, Inc. is a wholesale automobile

---

[1] Am. Compl., Docket No. 7.
[2] Notice of Removal, Docket No. 2 ¶¶ 10–11.

1

auction company that facilitates the exchange of vehicles between buyers and sellers. The court refers to these entities collectively as "ADESA" or "Defendants."

ADESA facilitates the sale of vehicles in two ways: by auction and by direct sale ("off-block").[3] Buyers and sellers who transact business through ADESA's services sign ADESA's Terms and Conditions,[4] which "govern the relationship and become a part of any and all transactions hereafter undertaken by, between, and among the persons or entities using [ADESA's] services . . . and [ADESA]."[5] The Terms and Conditions state that the customer voluntarily agrees to them in consideration of ADESA permitting the customer to use ADESA's services.[6] The Terms and Conditions also include the following provisions:

> [ADESA] is a service company and generally does not take title to, purchase or sell Vehicles. Rather, [ADESA] facilitates the exchange of Vehicles between Seller and Buyer . . . . In any Vehicle purchase transaction, [ADESA] shall not be deemed or considered the Vehicle's Seller under any circumstances, except where [ADESA] has specifically identified itself as Seller on the sale contract.[7]
>
> [. . .]
>
> Customer warrants, represents and guarantees possession and conveyance of a certificate of title, properly executed, valid in the state where the transaction is occurring and clear of all liens and encumbrances . . . and Customer warrants and will defend the title against the claims and demands of all person[s] whatsoever. Customer further acknowledges that with respect to purchased Vehicles, [ADESA] has assumed no responsibility to investigate Seller's title or to otherwise identify defects in Seller's title or title documents, and makes no warranty whatsoever regarding title or title documents.[8]
>
> [. . .]

---

[3] Defs.' Proposed Fact 17, Docket No. 30 at 12.

[4] Defs.' Proposed Fact 1, Docket No. 30 at 8–9; Resp. to Pls.' Mot. Ex. 1 ("Terms and Conditions"), Docket No. 30-2.

[5] Terms and Conditions at 2.

[6] *Id.* § I ¶ 1.

[7] *Id.* § I ¶ 10.

[8] *Id.* § I ¶ 16.

> [ADESA] is not responsible for, nor does it represent or warrant . . . warranties of title, merchantability or fitness for a particular purpose . . . .[9]
>
> [. . .]
>
> Customer shall indemnify, defend and hold harmless [ADESA] . . . from and against any liability, loss, damage, cost, expense, claim, suit or demand, including . . . resulting from, arising out of or connected, directly or indirectly, with any claim of breach of warranty or by a breach by Customer of any of these Terms and Conditions, including, but not limited to, all claims, allegations, and demands whatsoever challenging the validity of Seller's title or title documents.[10]

The Terms and Conditions also provide a general release of liability for ADESA against "damages or lost profits that result from or are related to the sale, distribution or use of, or the inability to use, any Vehicle."[11] The document identifies Indiana law as governing the agreement.[12] Davila acknowledged that his signature, dated July 5, 2016,[13] appears on the Terms and Conditions on behalf of CTR Motors.[14]

At some point in October 2016, Davila and an ADESA employee discussed CTR Motors' potential purchase of a 2015 Lamborghini Huracan (the "vehicle") owned by Specialized Sales and Leasing ("Specialized Sales").[15] ADESA records indicate that on October 6, 2016, the vehicle was consigned by Specialized Sales and that "Title Arrived: 10/06/16."[16] On or about October 11,

---

[9] *Id.* § I ¶ 18.

[10] *Id.* § I ¶ 21.

[11] *Id.* § I ¶ 23.

[12] *Id.* § I ¶ 32.

[13] *Id.* at 17.

[14] Defs.' Proposed Fact 15, Docket No. 30 at 12; Resp. to Defs.' Proposed Fact 15, Docket No. 31 at 9.

[15] Pls.' Proposed Fact 5, Docket No. 21 at 3; Resp. to Pls.' Proposed Fact 5, Docket No. 30 at 3–4.

[16] Reply on Pls.' Mot. Ex. A, Docket No. 31-1.

2016, Davila, acting on behalf of CTR Motors, purchased the vehicle for $148,500.[17] ADESA documentation shows that CTR Motors paid $148,500, of which ADESA retained a $250 buyer fee.[18] ADESA then paid Specialized Sales $147,924—equal to the $148,250 from CTR Motors minus the seller fee of $200 and an accounts receivable payment of $126.[19] The sales ticket for the vehicle identifies the seller as Specialized Sales and the buyer as CTR Motors represented by Davila.[20] The sales ticket states,

> Buyer and Seller agree that the vehicle described herein is bought and sold subject to Auction Rules & Policies, the terms of which they acknowledge were communicated in writing via hand delivery, delivery by U.S. mail, on-line at the auction website, and/or by posting on the auction premises, and that such Auction Rules & Policies are incorporated herein by reference.[21]

Davila testified that ADESA employees orally represented to him that the vehicle had clean title.[22] He indicated that Specialized Sales signed the title and turned it in to ADESA, which "check[ed] it" and gave it to him.[23]

Davila alleges that, unbeknownst to him at the time of the sale, the vehicle had been "stolen"—*i.e.*, its title had been fraudulently released from a valid lien in Texas.[24] Although ADESA contends that there is no admissible evidence supporting that the title had been fraudulently released from a valid lien, for these motions the court assumes without deciding that

---

[17] Pls.' Proposed Facts 6–7, Docket No. 21 at 3; Defs.' Proposed Fact 17, Docket No. 30 at 12; Am. Compl. Ex. B, Docket No. 7 at 15; Resp. to Defs.' Mot. Ex. H, Docket No. 34-2.

[18] Reply on Pls.' Mot. Ex. A.

[19] *Id.*

[20] Am. Compl. Ex. B; Resp. to Defs.' Mot. Ex. H.

[21] Am. Compl. Ex. B.

[22] CTR Motors Dep. at 220:4–21, 294:3–295:1, Docket No. 30-4.

[23] *Id.* at 295:22–296:2.

[24] Pls.' Proposed Fact 9, Docket No. 21 at 4.

the vehicle was in fact "stolen" in the manner alleged. Ten months after CTR Motors purchased the vehicle, local police allegedly informed Davila that the vehicle had been stolen and impounded it.[25] Davila testified that he was able to retrieve the vehicle two days later by showing proof of ownership[26] but was soon told he had to give the car back.[27] Davila testified that he called ADESA, which instructed him to return the vehicle to ADESA while the situation was sorted out.[28] While the vehicle was with ADESA, it was impounded and returned to Texas.[29]

In this suit, Plaintiffs claim breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of the implied warranty of merchantability, or in the alternative, request equitable relief. Plaintiffs also claim conversion and negligent misrepresentation. ADESA makes several counterclaims against Plaintiffs and cross-claims against Specialized Sales.[30]

Plaintiffs filed a motion for summary judgment on two claims: breach of the implied warranty of merchantability and conversion.[31] ADESA then filed a motion for summary judgment on all of Plaintiffs' claims.[32]

---

[25] Pls.' Proposed Fact 8, Docket No. 21, at 4; CTR Motors Dep. at 178:21–180:12.
[26] CTR Motors Dep. at 180:12–14.
[27] *Id.* at 180:15–21.
[28] *Id.* at 177:17–8.
[29] *Id.* at 178:2–3; Pls.' Proposed Fact 10, Docket No. 21 at 4.
[30] Answer, Docket No. 15.
[31] Docket No. 21.
[32] Docket No. 33.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[33] In considering whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[34] The Court is required to construe all facts and make all reasonable inferences in the light most favorable to the nonmoving party.[35]

## III.  DISCUSSION

The court notes at the outset that this case involves a written contract between sophisticated parties. Contracts such as these are fundamental building blocks of society and the court honors them except in rare circumstances. The Terms and Conditions expressly govern all transactions between these parties and Plaintiffs have not shown circumstances that would render the agreement unenforceable or inapplicable.

A.  Contract Claims

The parties agree that Indiana law governs Plaintiffs' contract claims.[36]

1.  Breach of Contract (Claim One)

Defendants move for summary judgment on Plaintiffs' breach of contract claim. To recover for a breach of contract under Indiana law, "a plaintiff must prove that: (1) a contract existed, (2)

---

[33] FED. R. CIV. P. 56(a).

[34] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[35] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[36] Resp. to Pls.' Mot., Docket No. 30 at 15; Reply on Pls.' Mot., Docket No. 31 at 11–12.

the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach."[37] Plaintiffs claim that Defendants breached the contract by selling a vehicle that did not have clean title,[38] but they point to no provision of the Terms and Conditions that requires otherwise. In fact, the Terms and Conditions expressly and repeatedly disclaim any title warranty. Thus, Plaintiffs have not stated a breach of contract claim.

Rather than explain their breach of contract theory, Plaintiffs argue that "it is not required that a plaintiff prove its case to survive summary judgment."[39] To be sure, a party need not prove its case conclusively to survive summary judgment, but it must show that there is evidence on which a trier of fact could return a verdict in its favor.[40] Plaintiffs point to no evidence that Defendants breached the contract, so the court will grant summary judgment for the Defendants.

    2.   Breach of the Implied Covenant of Good Faith and Fair Dealing (Claim Two)

Defendants move for summary judgment on Plaintiffs' claim for breach of the implied duty of good faith and fair dealing. The duty of good faith and fair dealing "embraces, among other things, an implied obligation that neither party will do anything to injure or destroy the right of the other party to receive the benefits of the agreement."[41] In Indiana, the duty applies only to the discharge of a specific obligation under the contract; "it does not create a duty where none

---

[37] *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007).

[38] Am. Compl. ¶ 30.

[39] Resp. to Defs.' Mot., Docket No. 34 at 22.

[40] *Anderson*, 477 U.S. at 248–49.

[41] 23 Williston on Contracts § 63:22 (4th ed.).

exists."[42] "[T]he implied covenant of good faith is used as a construction aid to assist the Court in determining whether the manner in which one party exercised its discretion under the contract violated the reasonable expectations of the parties when they entered into the contract."[43]

As an initial matter, it is unclear that Indiana law would imply any obligation of good faith and fair dealing in this contract. Indiana common law is skeptical of implied covenants and "does not impose a generalized duty of good faith and fair dealing on every contract; the recognition of an implied covenant is generally limited to employment contracts and insurance contracts."[44] The Indiana Commercial Code ("ICC") imposes an obligation of good faith,[45] but the ICC covers only contracts for the sale of goods and certain other specified transactions, not contracts for services.[46] The contract between these parties was not for sale of the vehicle but for services facilitating the sale.[47]

---

[42] *Acheron Med. Supply, LLC v. Cook Inc.*, No. 1:15-CV-1510-WTL-MPB, 2017 WL 4310163, at *9 (S.D. Ind. Sept. 28, 2017), *aff'd sub nom. Acheron Med. Supply, LLC v. Cook Med. Inc.*, 958 F.3d 637 (7th Cir. 2020).

[43] *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 675 (7th Cir. 2013) (Darrow, J., concurring) (applying Illinois law).

[44] *Gerdon Auto Sales, Inc. v. John Jones Chrysler Dodge Jeep Ram*, 98 N.E.3d 73, 82 (Ind. Ct. App. 2018) (internal quotation marks and citation omitted); *see also Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002).

[45] Ind. Code § 26-1-1-203.

[46] *Insul-Mark Midwest, Inc. v. Modern Materials, Inc.*, 612 N.E.2d 550, 553–56 (Ind. 1993) (finding that contract primarily for services was not governed by the ICC but by common law).

[47] *See Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 529–31 (7th Cir. 1999) (explaining process for determining whether a contract is one for goods or services); Terms and Conditions preface ("Customer's access or use of Auction's services . . . will constitute full acceptance of the then current Terms and Conditions."); § I ¶ 10 ("Auction Company is a service company and generally does not take title to, purchase or sell Vehicles. Rather, Auction Company facilitates the exchange of Vehicles between Seller and Buyer at the Auction. . . . Auction Company otherwise is not a party to any sale contract."); § I ¶ 11 ("Customer agrees to pay all service fees and charges of Auction for services rendered by Auction"); and signature page ("By accessing or using the Auction, Customer agrees to abide by all the terms and conditions set forth in these Terms and Conditions.").

Even if the court were to find such an implied duty under Indiana law, Plaintiffs cannot show any violation by Defendants. Plaintiffs have not alleged anything that could be construed as interfering with Plaintiffs' rights under the Terms and Conditions. The purpose of the agreement was to allow Plaintiffs to participate in Defendants' services, and there is no evidence that Plaintiffs were ever unable to do so. Plaintiffs are improperly attempting to write into the contract a term (a title warranty) that is not there and is in fact expressly disclaimed.[48] Therefore, the court will grant Defendants' motion for summary judgment on this claim.

3. Breach of the Implied Warranty of Merchantability (Claim Three)

Both parties move for summary judgment on Plaintiffs' claim for breach of the implied warranty of merchantability. The ICC states that "[u]nless excluded or modified [under Ind. Code 26-1-2-316], a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."[49] A "sale" is "the passing of title from the seller to the buyer for a price"[50] and a "seller" is "a person who sells or contracts to sell goods."[51]

The Terms and Conditions expressly excludes any warranty of merchantability. Even if it did not, the implied warranty of merchantability under the ICC would not apply because the

---

[48] *See Acheron Med. Supply*, 958 F.3d at 643 ("The obligation of good faith and fair dealing . . . does not . . . permit a party to enforce an obligation not present in the contract.") (internal quotation marks and citation omitted).

[49] Ind. Code § 26-1-2-314.

[50] Ind. Code § 26-1-2-106(1).

[51] Ind. Code § 26-1-2-103(1)(d).

agreement was not a contract for the sale of goods and Defendants were not sellers.[52] Plaintiffs' own proposed fact states that Defendants facilitate sales,[53] not that they sell. Although Defendants appear to have had physical possession of the title document at some point, there is no evidence that Defendants ever held legal title to the vehicle or purported to pass legal title to Plaintiffs. Indeed, the sales slip identified the seller as Specialized Sales, not Defendants.[54]

Furthermore, even if a warranty of merchantability could be read into the contract, the problem with the vehicle's title did not breach that warranty. Merchantability has to do with the quality of the goods, not their legal status. The ICC contains a non-exhaustive definition of merchantability as follows:

> (2) Goods to be merchantable must be at least such as:
> (a) pass without objection in the trade under the contract description; and
> (b) in the case of fungible goods, are of fair, average quality within the description; and
> (c) are fit for the ordinary purposes for which such goods are used; and
> (d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and
> (e) are adequately contained, packaged, and labeled as the agreement may require; and
> (f) conform to the promises or affirmations of fact made on the container or label if any.[55]

Although the list is non-exhaustive, it illustrates that the warranty of merchantability is concerned with the condition of goods, not their legal status. Indiana courts have confirmed that

---

[52] *See supra* note 47; *cf. Oscar Mayer Corp. v. Mincing Trading Corp.*, 744 F. Supp. 79, 83 (D.N.J. 1990) (holding that, under the New York Uniform Commercial Code, a broker who never had title to the goods was not their "seller" and therefore could not be liable under an implied warranty).

[53] Pls.' Proposed Fact 4, Docket No. 21 at 3 ("ADESA serves as a service company that facilitates the exchange of vehicles between buyers and sellers.").

[54] Am. Compl. Ex. B.

[55] Ind. Code § 26-1-2-314.

"[m]erchantable goods conform to ordinary standards of care and . . . are of average grade, quality, and value of similar goods sold under similar conditions"[56] and that merchantability of a vehicle refers to its ability to provide transportation—nothing more.[57] Here, there is no evidence that there was anything physically wrong with the vehicle, so there is no valid merchantability claim.

In their opposition to Defendants' summary judgment motion, Plaintiffs argue breach of the implied warranty of title under Uniform Commercial Code ("UCC") § 2-312.[58] Plaintiffs raised no such claim in their Amended Complaint and may not raise it now. Indeed, the existence of a separate warranty of title provision in the UCC highlights the inappropriateness of attempting to shoehorn a warranty of title into the implied warranty of merchantability. Furthermore, a warranty of title claim would fail because, like the implied warranty of merchantability, it applies only to contracts for sale and only to sellers.[59]

In sum, far from showing that they are entitled to summary judgment on the implied warranty of merchantability claim, Plaintiffs have shown that they cannot prevail on it. The court will deny Plaintiffs' motion for summary judgment and grant Defendants' motion on this claim.

---

[56] *Sharp v. Tom Wood E., Inc.*, 822 N.E.2d 173, 175 (Ind. Ct. App. 2004) (internal quotation marks and citation omitted).

[57] *Id.* (explaining that a vehicle was merchantable under Indiana law where it had been driven 64,669 miles and provided plaintiff with transportation for more than 22,000 miles over thirteen months); *cf. Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 588 (7th Cir. 2001) (explaining that the fact that plaintiff continued to drive vehicle and drove it more than 30,000 miles negated merchantability claim under Illinois law); *In re Air Bag Prods. Liability Litig.*, 7 F. Supp. 2d 792, 803 (E.D. La. 1998) (explaining that under Texas law a merchantability claim must include an allegation that a vehicle component "functioned improperly under normal use"); *Lee v. Gen. Motors Corp.*, 950 F. Supp. 170, 174 (S.D. Miss. 1996) (holding that under Mississippi law there was no merchantability claim where vehicles had been driven for five years and 90,000 miles).

[58] Resp. to Defs.' Mot. at 19–20.

[59] *See* Ind. Code § 26-1-2-312.

B. Quasi-Contract, Unjust Enrichment and/or Quantum Meruit (Claim Four)

Equitable remedies such as quasi-contract, unjust enrichment, and quantum meruit are available only where the parties' relationship is not governed by an express contract.[60] Here, a contract governs the relationship between Plaintiffs and Defendants, including the specific subject matter at issue. Therefore, equitable remedies are unavailable. Even if there were not a valid contract covering this subject matter, Plaintiffs could not recover under these theories because these theories are concerned with rectifying transactions in which one party benefits unjustly at the expense of the other.[61] Here, Plaintiffs paid Defendants a fee in exchange for which Defendants allowed Plaintiffs to use their services to purchase the vehicle. There is no inequality here—no one-sided benefit—and therefore no basis on which to impose equitable remedies. Summary judgment will be granted in favor of Defendants on this claim.

C. Tort Claims

In diversity actions, federal courts apply the choice of law rules of the forum state.[62] The Utah Supreme Court has adopted the "most significant relationship approach" to tort claims as articulated in the Restatement (Second) of Conflict of Laws § 145.[63] The contacts taken into account include the place of injury; the place of conduct causing the injury; the parties' domiciles,

---

[60] *Old Nat'l Bank v. Kelly*, 31 N.E.3d 522, 533 (Ind. Ct. App. 2015); *U.S. Fid. v. U.S. Sports Specialty*, 2012 UT 3, ¶¶ 12–13, 270 P.3d 464; Restatement (Third) of Restitution and Unjust Enrichment § 2(2) (2011) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.").

[61] Restatement (Third) of Restitution and Unjust Enrichment § 1.

[62] *N8 Med., Inc. v. Colgate-Palmolive Co.*, 727 F. App'x 482, 485 (10th Cir. 2018) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

[63] *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 14, 54 P.3d 1054 (internal quotation marks and citations omitted).

residences, places of business, etc.; and the place where the relationship between the parties is centered.[64] Plaintiffs are Utah citizens who purchased the vehicle at ADESA's Utah location from a dealer with a Utah address, so Utah has the most significant relationship and Utah tort law governs.

1. Economic Loss Rule

Defendants argue that Plaintiffs' tort claims are barred by the economic loss rule, which generally forbids recovery in tort for purely economic harm where a contract governs the relationship between the parties.[65] Plaintiffs argue against applying the economic loss rule because either the contract was unenforceable or Defendants owed an independent duty of care. The court will not resolve this issue because Plaintiffs' tort claims fail on the merits as discussed below.

2. Conversion

Both parties move for summary judgment on the conversion claim. Conversion is "an act of wilful [sic] interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession."[66] "To prove conversion, a party must establish an act of willful interference with property, done without lawful justification, by which the person entitled to property is deprived of its use and possession, and that the party is entitled to immediate possession of the property at the time of the alleged conversion."[67]

---

[64] *Id.* ¶ 18; *see also* Restatement (Second) of Conflict of Laws § 145(2).

[65] *See Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶ 18, 221 P.3d 234.

[66] *Allred v. Hinkley*, 328 P.2d 726, 728 (Utah 1958).

[67] *Rand v. KOA Campgrounds*, 2014 UT App 246, ¶ 11, 338 P.3d 222 (internal quotation marks and citations omitted).

Plaintiffs do not mention the elements of conversion in their memorandum, let alone show that there is no genuine issue of material fact as to Defendants' liability. In fact, Plaintiffs cannot recover for conversion because if the vehicle had been stolen as Plaintiffs allege then Plaintiffs were not entitled to the vehicle. The entity with a colorable claim for conversion would be the valid lien-holder in Texas.

Plaintiffs insist that auction houses are "strictly liable to verify ownership and viability of the goods sold through their services."[68] This is a misreading of the case law. Plaintiffs cite *First National Bank of Amarillo v. Southwestern Livestock, Inc.*[69] and *United States v. Topeka Livestock Auction Inc.*,[70] in which courts held that auctioneers who sold goods subject to security interests were liable for conversion even though they were ignorant of the security interests. Plaintiffs also seize on language in the 1958 Utah Supreme Court case of *Allred v. Hinckley* that "an auctioneer who sells [stolen goods] in good faith becomes a converter."[71] But in these cases, the one seeking to recover for conversion was the lienor or rightful owner. Plaintiffs have not shown that they were the rightful owners of the vehicle.[72] According to their own facts, they were not. In other words, even if Defendants were liable for conversion, they would not be liable to Plaintiffs.

Furthermore, even if there were a rule that auctioneers must warrant title to goods, this would not support holding ADESA liable because ADESA was not acting in its capacity as an

---

[68] Pls.' Mot. at 4, Docket No. 21 at 4; Reply on Pls.' Mot. at 14.

[69] 859 F.2d 847 (10th Cir. 1988).

[70] 392 F. Supp. 944 (N.D. Ind. 1975).

[71] *Allred*, 328 P.2d at 728.

[72] Plaintiffs cite *Riverside Nat'l Bank v. Law*, 1977 OK 84, 564 P.2d 240, in an apparent attempt to show that they were entitled to the vehicle, but the case is not controlling, factually inapposite, and not about conversion.

auction house in this transaction. Plaintiffs provide no authority holding that a consignee must warrant title to goods sold on behalf of a consignor in the type of sale that occurred here.

Because Plaintiffs cannot prevail on their conversion claim, the court will deny their motion for summary judgment and grant Defendants' motion on this claim.

D. Negligent Misrepresentation (Claim Six)

Defendants move for summary judgment on Plaintiffs' negligent misrepresentation claim. Under Utah law, "a claim for negligent misrepresentation requires a party to demonstrate that (1) a party carelessly or negligently makes a false representation expecting the other party to rely and act thereon, (2) the plaintiff actually relies on the statement, and (3) suffers a loss as a result of that reliance."[73]

Plaintiffs claim that Defendants falsely represented that the vehicle had clean title and either knew or should have known that it did not.[74] The evidence does not support this. The sale occurred in 2016, and there is no evidence that anyone knew about any title problems prior to 2017.[75] Thus, Plaintiffs cannot show that Defendants were careless or negligent for failing to disclose the problem with the title.

Plaintiffs also cannot show that the alleged statements were false. Plaintiffs assert that an ADESA employee told Davila to purchase the vehicle through ADESA because "it's a lot safer. Trust me. It's a lot safer."[76] Davila testified that an employee told him, "Be safe. Do it through

---

[73] *Moore v. Smith*, 2007 UT App 101, ¶ 36 n.12, 158 P.3d 562, 573 (internal quotation marks and citations omitted).

[74] Am. Compl. ¶¶ 64–65.

[75] Pls.' Mot. Ex. C, Docket No. 22-2; CTR Motors Dep. at 223:5–225:20, Docket No. 30-4.

[76] CTR Motors Dep. at 100:4–9.

here. You'll get the title, everything is good. Any problems, you can just unwind the deal."[77] These are very vague assurances; they do not amount to a representation that ADESA would warrant title. Additionally, the evidence shows that it was by some measures "safer" to purchase through ADESA; the Terms and Conditions include mechanisms to protect buyers including an arbitration process,[78] and Davila testified that in the past ADESA would "unwind" a sale if, for example, the title did not arrive on time.[79]

Davila also testified that ADESA agreed to "check" the vehicle's title[80] and that ADESA's title clerk affirmed that the title was "clear."[81] Plaintiffs cannot show that these were misrepresentations or that they were negligently made. ADESA Utah's General Manager declared that to "check" title meant that ADESA would compare the year, make, and VIN number on the vehicle with the information contained on the vehicle's title,[82] and there is no evidence that ADESA did not in fact "check" this title. There is a dearth of evidence about what "clear" title might have meant in the context in which ADESA's title clerk allegedly used the term, or that title was not "clear" at the time she allegedly made that representation. And even if these were misrepresentations, Plaintiffs have not provided evidence showing that they were carelessly or negligently made. Summary judgment will be granted for Defendants on the negligent misrepresentation claim.

---

[77] *Id.* at 220:19–21.

[78] Terms and Conditions § I ¶ 15.

[79] CTR Motors Dep. at 176:18–177:4.

[80] *Id.* at 295:25–296:2.

[81] *Id.* at 294:24–295:1.

[82] Second Decl. of Jeff Brinkley ¶¶ 3, 5, Docket No. 37-7.

## IV. CONCLUSION

It is therefore ORDERED that Plaintiffs' Motion for Summary Judgment (Docket No. 21) is DENIED.

It is FURTHER ORDERED that Defendants' Motion for Summary Judgment (Docket No. 33) is GRANTED.

DATED this 25th day of August, 2021.

BY THE COURT:

_____
Ted Stewart
United States District Judge